IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>      PLAINTIFF,<br><br>      *v.*<br><br>UNDETERMINED QUANTITIES OF . . .<br>1,3-DIMETHYLAMYLAMINE HCL<br>(DMAA) . . .<br><br>      DEFENDANTS,<br><br>and<br><br>HI-TECH PHARMACEUTICALS, INC.,<br>AND JARED WHEAT,<br><br>      CLAIMANTS. | Civil Action No.<br><br>1:13-cv-03675-WBH-JCF |

## MEMORANDUM IN SUPPORT OF
## THE UNITED STATES' MOTION FOR SUMMARY JUDGMENT

The issue in this case is whether the chemical 1, 3-Dimethylamylamine HCl ("DMAA") when added to food is a "dietary ingredient" or a "food additive" under the Federal Food, Drug, and Cosmetic Act. To decide this issue, this Court needs to resolve only two questions.

First, is DMAA naturally produced by geranium plants? It is not. The drug maker Eli Lilly and Company invented and patented DMAA in the 1940s,

and included it as a synthetically-produced, active ingredient in a drug.  No one had seen, heard of, or mentioned DMAA in any food or scientific literature before Eli Lilly invented it.  The United States' uncontroverted testimony establishes that there is no known biological process by which a geranium plant could make DMAA.  Therefore, DMAA is not a constituent of the geranium plant and is not a dietary ingredient.

Second, because DMAA is not a dietary ingredient, is it generally recognized by qualified experts as safe for use in food?  It is not.  There is no *general recognition* among qualified experts about the safety of DMAA's use in food.  Published reports raise concerns about DMAA's association with adverse health effects.  Although the potential effects of long-term use of DMAA in food by the general population need to be evaluated for general recognition of safety, no published studies or data address long-term DMAA consumption by humans. Safety assessments conducted by numerous authorities, including the U.S. Department of Defense, raise concerns about the safety and lack of information about DMAA.  In fact, the Department of Defense banned the sale of products containing DMAA on military bases.  Thus, because DMAA is not a dietary ingredient and is not generally recognized by qualified experts as safe, it is a food additive.

Based on these two answers, the rest of the legal issues resolve themselves. Because DMAA is not a dietary ingredient, is not generally recognized as safe, and does not meet any other statutory exceptions or exemptions for use in food, DMAA is deemed to be an unsafe food additive. Foods, including dietary supplements, that contain unsafe food additives, are adulterated. The United States is entitled to summary judgment on these issues and a judgment of condemnation and forfeiture for the seized articles that contain DMAA.

The United States also is entitled to summary judgment on Hi-Tech Pharmaceuticals, Inc.'s claims against the Food and Drug Administration ("FDA"). This Court already determined that "[i]f the Government is entitled to seize Hi-Tech's products, the claims in Hi-Tech's complaint fail." Moreover, even if Hi-Tech's claims are considered substantively, the claims are meritless.

## BACKGROUND AND STATUTORY SCHEME

### A. DMAA

DMAA was developed by the pharmaceutical company Eli Lilly and Company in the 1940s.[1] In 1944, Eli Lilly secured a patent for three synthetic chemical processes used to produce DMAA. Ex. A, U.S. Patent No. 2,350,318

---

[1] DMAA is also referred to as 4-methylhexan-2-amine, 1,3-dimethylpentylamine, and methylhexaneamine. *See* Brown Decl. ¶ 4.

(issued May 30, 1944). Until 1983, Eli Lilly included DMAA as the active ingredient in Forthane, a nasal decongestant, which was marketed pursuant to a New Drug Application. 37 Fed. Reg. 13,490, July 8, 1972 (listing Forthane on page 13,491 as containing DMAA); 48 Fed. Reg. 51,536, November 9, 1983 (listing withdrawal of New Drug Application for Forthane).

### B. FDA's Legal Authority to Regulate Food (Including Dietary Supplements) and Food Additives

#### 1. Dietary Ingredients, Substances That Are Generally Recognized As Safe, And Food Additives

The Federal Food, Drug, and Cosmetic Act ("FFDCA" or "the Act") authorizes FDA to regulate food, including dietary supplements. *See* 21 U.S.C. §§ 321(f) (defining "food" as articles used for food and drink and components of food); 321(ff) (except for purposes not applicable here, "a dietary supplement shall be deemed to be a food within the meaning of the [FFDCA]"). As a substance added to food, how DMAA is regulated depends upon its categorization under the FFDCA.

Three categories of substances added to food are relevant to this case: dietary ingredients, substances that are generally recognized as safe, and food additives. The distinction between these three statutory categories is not mere legal minutia. Rather, each category reflects the fundamental nature of the

substance, the level of knowledge about the substance, and what showing needs to be made about its acceptability for use in food.

Substances that are "dietary ingredients" are set forth in 21 U.S.C. § 321(ff) and include:

(A)     a vitamin;
(B)     a mineral;
(C)     an herb or other botanical;
(D)     an amino acid;
(E)     a dietary substance for use by man to supplement the diet by increasing the total dietary intake; or
(F)     a concentrate, metabolite, constituent, extract, or combination of any ingredient described in clause (A), (B), (C), (D), or (E).

As set forth below, DMAA is not a dietary ingredient. If a substance in a dietary supplement does not qualify as a "dietary ingredient" under 21 U.S.C. § 321(ff)(1)(A)-(F), the next step is to determine whether the substance is a food additive under the Act. 21 U.S.C. § 321(s).

A "food additive" is defined as:

any substance the intended use of which results or may reasonably be expected to result, directly or indirectly, in its becoming a component . . . of any food . . . if such substance is not generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on

> common use in food) to be safe under the conditions of
> its intended use; except that such term does not
> include—
> (1) a pesticide chemical residue in or on a raw
> agricultural commodity or processed food; or
> (2) a pesticide chemical; or
> (3) a color additive; or
> (4) any substance used in accordance with a sanction or
> approval granted prior to September 6, 1958 . . .
> (5) a new animal drug; or
> (6) an ingredient described in paragraph (ff) in, or
> intended for use in, a dietary supplement.

21 U.S.C. § 321(s).  Thus, if the substance is not generally recognized by qualified expert as safe and does not fall within another exemption from the food additive definition (such as a new animal drug), it is a food additive.  As set forth herein, DMAA is a food additive.

### 2.  Regulation of Foods That Contain Unsafe Food Additives

A food additive ordinarily "shall . . . be deemed to be unsafe" unless FDA has approved or exempted its use by regulation and its use conforms to such regulation.  *Id.* § 348(a).  Foods, including dietary supplements, that contain unsafe food additives are adulterated and subject to condemnation and forfeiture.  21 U.S.C. §§ 334(a)(1), 342(a)(2)(C)(i).  FDA has never approved the use of DMAA in food.  *See* Keefe Decl. ¶¶ 27, 30 & n.5.  A dietary supplement that contains DMAA is thus adulterated.

Depending on the category of a substance added to food, such food may be subject to several different FFDCA statutory and regulatory provisions. Specifically, a dietary supplement containing a substance that meets the food additive definition is subject to the FFDCA's food additive provisions, as well as some of the Act's dietary supplement provisions. As FDA has explained in a guidance for industry, "non-dietary ingredients added to a dietary supplement must be used in accordance with a food additive regulation or be [generally recognized as safe] for their intended use." FDA, *Guidance for Industry: Considerations Regarding Substances Added to Foods, Including Beverages and Dietary Supplements*, Jan. 2014, at 5, http://www. fda.gov/downloads/ Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInformation/Ingred ientsAdditivesGRASPackaging/UCM381316.pdf.

Through the Act, Congress provided FDA with the authority to take action to protect the American public from unsafe food additives. *See, e.g.*, 21 U.S.C. §§ 334 (seizure of adulterated articles), 342(a)(2)(C)(i) (unsafe food additives are adulterated). This enforcement authority is critically important to ensure that foods, including dietary supplements, sold to the general public do not contain substances that have not traditionally been part of the human diet, or for which

there is no general recognition by qualified experts that the substances are safe, or that are not being used pursuant to an existing regulation or FDA approval.

## C. Case History

On November 7, 2013, the United States filed its initial Complaint for Forfeiture in the Northern District of Georgia against the above-captioned articles belonging to Claimants Hi-Tech Pharmaceuticals, Inc. and Jared Wheat (collectively, "Hi-Tech"). ECF No. 1. On March 26, 2014, the United States filed an Amended Complaint for Forfeiture, alleging that the seized articles containing DMAA were adulterated while held for sale after shipment in interstate commerce. *See* Am. Compl., ECF No. 25.[2]

On November 5, 2013, Hi-Tech filed an action against the FDA in the

---

[2] The United States also has alleged that two of the seized articles (Fastin and Geranium Powder) are misbranded because their labels state or imply that they contain DMAA when testing of the products by the United States did not find DMAA. Hi-Tech contends that its product Fastin does contain DMAA and has produced testing records of the seized lot purportedly reporting the presence of DMAA. For purposes of this summary judgment motion, the United States accepts Hi-Tech's evidence and contention that DMAA is present in Fastin. Should this Court find that DMAA is an unsafe food additive, the United States requests that Fastin be found to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i). The second product is the raw material labeled "Geranium Powder" or "Geranium Powder Extract." A judgment by this Court that products containing DMAA are adulterated will resolve the key issue in this case and, based on such a ruling, the United States would be prepared to address any remaining issues regarding this article outside of this case.

District for the District of Columbia, seeking declaratory and injunctive relief related to this enforcement action. ECF No. 41-1 ("APA Action"). Hi-Tech's APA Action was transferred to this Court and, on August 1, 2014, merged with the seizure action filed by the United States. ECF No. 29. Discovery concluded on December 14, 2016, and the matter is ready for summary judgment.

## ARGUMENT

No genuine issue exists as to any material fact needed to resolve this case. DMAA is not a dietary ingredient because it does not satisfy any of the statutory definitions, including that it is not a constituent of a botanical. *See* 21 U.S.C. § 321(ff)(1). Compounds that naturally occur in a plant must be assembled or made by the plant. Plants use multi-step biological processes or biosynthetic pathways to make specific compounds. Although Hi-Tech suggests DMAA is a constituent of *Pelargonium graveolens*, a species of geranium plant, the United States' uncontroverted expert testimony establishes that there is no known, plausible biological pathway by which a geranium plant could make DMAA. Thus, DMAA is not a constituent of the geranium plant, and is not a dietary ingredient.

Because DMAA is not a dietary ingredient, it is a food additive unless Hi-Tech can prove that DMAA meets the exemption as "*generally recognized*, among

experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use" ("GRAS"). 21 U.S.C. § 321(s) (emphasis added). There is no general recognition by qualified experts that the chemical DMAA is safe for use in food. Quite the contrary, published information raises concerns about the safety of DMAA in food and there is a lack of other information upon which qualified experts could conclude DMAA is GRAS. Moreover, the U.S. Department of Defense banned the sale of products containing DMAA on military bases, and other countries have restricted the sale of DMAA-containing products. Thus, DMAA is not GRAS.

Because DMAA is neither a dietary ingredient nor is it GRAS, it is therefore a food additive. As a food additive, DMAA is deemed unsafe unless it meets certain statutory exemptions. DMAA does not meet any of those exemptions. Thus, DMAA is a food additive that is deemed to be unsafe under 21 U.S.C. § 348. Any food (including dietary supplements) containing an unsafe food additive like DMAA is deemed to be adulterated under 21 U.S.C. § 342(a)(2)(C)(i). Adulterated foods are liable to seizure, condemnation, and

forfeiture pursuant to 21 U.S.C. § 334. Accordingly, the United States is entitled to summary judgment that the seized articles containing DMAA are adulterated and subject to condemnation and forfeiture.

Hi-Tech's APA Action solely raises questions of law ripe for summary judgment. Because the United States is entitled to summary judgment in the seizure action, "the claims in Hi-Tech's complaint fail." ECF No. 51, at 3. Even if the Court considers Hi-Tech's claims in the APA Action on their merits, none are legally supportable and the United States is entitled to summary judgment.

## I. **Burden of Proof**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the movant is, therefore, entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original). Summary judgment is appropriate in seizure actions brought under the FFDCA involving food additives. *See, e.g.*, *United States v. 45/194 Kg. Drums of Pure Vegetable Oil*, 961 F.2d 808, 813 (9th Cir. 1992) (affirming summary judgment that substance was not generally recognized as safe).

To establish the adulteration claim in the seizure action, the United States must show that DMAA is in the seized articles and is not a dietary ingredient within the meaning of 21 U.S.C. § 321(ff)(1). The United States' evidence proves that DMAA is not a constituent of the geranium plant, nor does it meet any other definition of dietary ingredient in 21 U.S.C. § 321(ff)(1). The burden thus shifts to Hi-Tech to put forward "significant, probative evidence demonstrating" a genuine issue of material fact to avoid summary judgment. *United States v. Four Parcels of Real Property*, 942 F.2d 1428, 1438 (11th Cir. 1991) (en banc). Because DMAA is not a dietary ingredient, Hi-Tech bears the burden of showing that DMAA is generally recognized as safe to avoid it being a food additive. *See, e.g.*, *United States v. An Article of Food*, 752 F.2d 11, 15 (1st Cir. 1985) ("The burden of proving general recognition of safe use is placed on the proponent of the food substance in question."); *United States v. An Article of Food*, 678 F.2d 735, 739 (7th Cir. 1982) (same). Hi-Tech bears the burden on its APA Action claims.

## II. Claimants' Seized Articles Containing DMAA Are Adulterated and Must Be Condemned and Forfeited.

A food, including a dietary supplement, shall be deemed to be adulterated "if it bears or contains . . . any food additive that is unsafe within the meaning of [21 U.S.C. § 348]." 21 U.S.C. § 342(a)(2)(C)(i). An article of food that is

adulterated while held for sale after shipment in interstate commerce is subject to condemnation and forfeiture under 21 U.S.C. § 334(a)(1).

The Parties have stipulated that all Defendants *in rem* are articles of food. ECF No. 58, ¶ 2. The Parties also have stipulated that all Defendants *in rem* consist in whole or in part of ingredients that moved in interstate commerce from outside the State of Georgia. *Id.*.

The only remaining questions are whether DMAA is a dietary ingredient, is excluded from the food additive definition because it is GRAS, or is a food additive. DMAA does not satisfy any of the statutory definitions of a dietary ingredient. *See* 21 U.S.C. § 321(ff)(1)(A)-(F). DMAA is not GRAS. Thus, DMAA is a food additive under 21 U.S.C. § 321(s).

Because DMAA is a food additive and its use in food does not conform with any regulations or exemptions issued by FDA, it is deemed to be an unsafe food additive. 21 U.S.C. § 348(a). Accordingly, the presence of DMAA, an unsafe food additive, in the seized articles of food renders those articles adulterated. 21 U.S.C. § 342(a)(2)(C)(i).

## A. **DMAA Is Not A Dietary Ingredient.**

There are six statutory definitions of a dietary ingredient. *See* 21 U.S.C. § 321(ff)(1)(A)-(F). Because Hi-Tech admits that DMAA is not a vitamin, mineral,

or amino acid,[3] only three of those definitions are relevant here: "an herb or botanical," "a dietary substance for use by man to supplement the diet by increasing the total dietary intake," and "a concentrate, metabolite, constituent, [or] extract" of a botanical. 21 U.S.C. § 321(ff)(1)(C), (E), and (F).

DMAA is not itself a plant, is not a constituent of the geranium plant, and is not a dietary substance commonly eaten by humans to increase their total dietary intake and therefore, DMAA is not a dietary ingredient.

### 1. DMAA is not an herb or other botanical.

An herb or other botanical consists of a plant, alga, or fungus, or a physical part or secretion of a plant, alga, or fungus, such as bark, leaves or fruits. Welch Decl. ¶ 9. DMAA is an organic compound with a distinct chemical structure. *Id.* DMAA is not a complex multicellular organism like a plant, alga, or fungus. *Id.* Hi-Tech concedes as much. *See* Ex. G, Wheat Dep. 83:25 - 84:2 (admitting that it was not Hi-Tech's position that there was a DMAA plant). Thus, DMAA is not an herb or other botanical under 21 U.S.C. § 321(ff)(1)(C).

### 2. DMAA is not a constituent of the geranium plant.

DMAA was developed and patented by Eli Lilly and Company in 1944.

---

[3] *See* Ex. C, Claimants' Resp. to Requests for Admis. Nos. 12–13, 15; 21 U.S.C. § 321(ff)(1)(A), (B), (D).

Ex. A, U.S. Patent No. 2,350,318 (issued May 30, 1944).  Until 1983, it was included as an active ingredient in Eli Lilly's nasal decongestant drug Forthane. 37 Fed. Reg. 13,490, July 8, 1972 (listing Forthane on page 13,491 as containing DMAA); 48 Fed. Reg. 51,536, November 9, 1983 (listing withdrawal of New Drug Application for Forthane).  The United States' and Hi-Tech's experts searched and found no mention of DMAA before Eli Lilly patented the chemical.  *See* Brown Decl. ¶ 6; Ex. H, Heuer Dep. 61:8–22; Ex. I, Simone Dep. 80:3–9.  Eli Lilly invented DMAA in Indianapolis, Indiana.  Ex. A, U.S. Patent No. 2,350,318 (issued May 30, 1944).

> ### a. There is no known biological process by which a geranium plant could make DMAA.

The actual, direct evidence about whether DMAA (or any other chemical compound) naturally occurs in a plant consists of identifying the biological process or biosynthetic pathway by which the plant could make the compound. Brown Decl. ¶ 13.  Chemical compounds that naturally occur in plants must be assembled by the plant.  *Id.* ¶ 12.  Plants use multi-step biological processes, also known as biosynthetic pathways, to modify, convert, or join together simpler compounds to make more complex compounds.  *Id.*  These steps used by plants to make compounds follow certain rules and tend to be highly specific.  *Id.*  Thus,

the process the plant uses to create a particular compound can be determined or predicted based on the compound's chemical structure. *Id.*

The United States' expert Dr. Paula Brown is an expert in plant biochemistry and in method development and validation for analysis of plants. *Id.* ¶ 3. Dr. Brown specifically investigated the possible biosynthetic pathways by which a plant could make DMAA. *Id.* ¶ 14. The scientific literature does not contain any reference to a known or proposed biosynthetic pathway for a plant to create DMAA. *Id.* Moreover, none of the known biosynthetic pathways used by geraniums to make compounds would produce the specific chemical structure of DMAA. *Id.* ¶¶ 15-20. The basic compounds commonly used by plants as precursors, or building blocks, to create more complex compounds like DMAA are not known to be able to create DMAA. *Id.* Thus, there is no evidence of a biosynthetic pathway by which geraniums would make DMAA. *Id.* ¶ 21.

Others who have studied DMAA, including the private testing laboratory Intertek USA Inc., have acknowledged that "[f]urther study [was] needed to elucidate the biosynthetic pathway of DMAAs [sic] in the geranium plant." Ex. N, at 57.[4] But Intertek has not identified any biosynthetic pathway by which a

---

[4] Although the Intertek Study contains a statement that the Study shows DMAA naturally occurs in geranium plants, *see* Ex. N, at 56, Dr. Junsuo Li, a co-author of

geranium plant makes DMAA. Ex. J, Li Dep. 53:22 – 54:6. Hi-Tech's experts Drs.

Marvin Heuer and Paul Simone denied even being qualified to speculate about a

biosynthetic pathway, and they did not take any efforts to determine such a

pathway. Ex. H, Heuer Dep. 118:6-15, 124:19 — 125:3; Ex. I, Simone Dep. 101:17 —

102:1, 202:5–16.

The uncontroverted evidence is clear: Geraniums cannot make DMAA.

There is no biological process or biosynthetic pathway by which a geranium

plant could do so. Absent such evidence, it is impossible to conclude that

DMAA is a constituent of the geranium plant. Accordingly, DMAA is not a

dietary ingredient under 21 U.S.C. § 321(ff)(1)(F).

### b. Tests of a handful of geranium plant samples do not answer the question of whether a geranium plant can naturally produce DMAA.

Although numerous studies of samples of geranium plants and oils did

not detect DMAA, *see* Brown Decl. ¶ 7, Hi-Tech cites a few studies that

purportedly detected DMAA in a handful of geranium plant samples at trace

---

the Intertek Study, testified under oath that the Study does *not* show that DMAA
was naturally produced by the geranium plant or how DMAA got into the
samples tested. Ex. J, Li Dep. 50:1-4; 62:3-9; 62:25 - 63:12; 74:4-10. Consistent
with Dr. Li's testimony, the Intertek Study states that further work needs to be
done to identify the biosynthetic pathway by which a geranium could make
DMAA. Ex. N, at 57.

levels from China.  *See* Ex. I, Simone Dep. 102:16 – 103:5 (defining trace

concentrations as levels of 1 part per billion to 100 parts per million).

Studies merely testing for the presence or absence of DMAA in a sample

do not directly address the pivotal issue of whether DMAA is a constituent of a

botanical.  Brown Decl. ¶¶ 8, 11.  The mere presence of a chemical in a sample

does not reveal how it got there.  Importantly, it does not preclude the possibility

that the chemical is a contaminant and not naturally produced by the plant.  *See*

*id.* ¶¶ 8-11.  Contamination of a sample can occur through a number of means

(e.g., fertilizer, soil, and water conditions), and at any stage from planting to

harvesting through processing and analysis.  *Id.* ¶¶ 9-10.  Contamination is but

one of the methodological and evidentiary limitations of the studies relied on by

Hi-Tech.  Others are readily apparent and even confirmed by the study authors

themselves.

The first study, the Ping Study, was published in 1996 originally in

Chinese.  Ex. I, Simone Dep. 175:11-16; 178:20-22.  The Government presented Hi-

Tech's experts with a copy of the Ping Study during their depositions and asked

them to describe where the study discusses DMAA.  Tellingly, Hi-Tech's experts

could not identify any place where the Ping Study even mentions DMAA.  Ex. H,

Heuer Dep. 154:9–15; Ex. I, Simone Dep. 188:1-9.  Hi-Tech's expert Dr. Paul

Simone went further and did not rely on the Ping Study because it was not conducted with a sufficient level of rigor. Ex. I, Simone Dep. 184:16-185:8.

The second, the Intertek Study, fares no better. Intertek reported detecting DMAA in three geranium plant samples at levels around 14 to 365 parts per billion. *See* Ex. J, Li Dep. 40:1-6; 75:12-21.[5] However, Intertek itself testified that its study was *not* designed to show whether DMAA naturally occurs in geraniums, and the study it conducted would *not* do that. *Id.* 34:10 – 35:4. Intertek further testified that its study does *not* show that DMAA was naturally produced by the geranium plant or how DMAA got into the samples. *Id.* 50:1-4; 62:3-9; 62:25 - 63:12; 74:4-10. Indeed, one of the co-authors of the Intertek Study said he had never seen "naturally-produced DMAA" in all his work related to DMAA. *Id.* 66:2-5.

The third, the Fleming Study, used the same limited approach as the Intertek Study. Ex. I, Simone Dep. 51:9-15. It reported detecting DMAA in three samples at levels of 69 to 254 parts per billion. *See id.* 225:15 – 226:7. But the Fleming Study conflicted even with the Intertek Study because it tested samples

---

[5] For purposes of its motion for summary judgment, the United States does not dispute that the Intertek and Fleming studies reported the presence of DMAA in certain samples tested.

from two of the same regions in China as the Intertek Study and did not detect

DMAA. *See id.* 213:2-4. Hi-Tech's expert Dr. Simone directed the research of the

Fleming Study. *Id.* 51:9 – 52:16. Like Intertek, Dr. Simone testified that the study

was *not* designed to determine whether DMAA was naturally produced by the

geranium plant. *Id.* 81:5-22.[6]

Dr. Simone went further. He identified the presence of DMAA in

commercially-available fertilizer. Ex. I, Simone Dep. 149:18 – 150:9; *see* Ex. D, at

4. Dr. Simone and Randall Bayer, the chairman of the Biology Department at the

University of Memphis, reported to the sponsor of the Fleming Study in a memo

labeled "CONFIDENTIAL – DO NOT DISTRIBUTE" that it was "an important

step" to screen for fertilizers containing DMAA because the fertilizers "could

potentially *contaminate*" samples. Ex. I, Simone Dep. 148:13 – 150:4 (emphasis

added); *see* Ex. D, at 4. They further reported that "[f]ertilizers containing

DMAA could potentially act as a source of DMAA into the human food diet."

Ex. I, Simone Dep. 150:21- 151:8; *see* Ex. D, at 4.

Dr. Simone understood that DMAA from fertilizer could be absorbed into

the plant through its root system. Ex. I, Simone Dep. 152:1-10. But Dr. Simone

---

[6] Although Dr. Simone is an expert for Hi-Tech, his deposition also was taken as
a fact witness. *Id.* 10:17-20.

did nothing further to rule out contamination because the research sponsor would not fund the work. *Id.* 153:10-18. Notably, neither the Fleming nor the Intertek Study researchers knew anything about the water, soil, or fertilizers used with the samples they tested. Ex. J, Li Dep. 22:2 - 23:10, 41:21 – 42:15; Ex. I, Simone Dep. 89:2-19. In other words, they could not rule out the possibility that contamination occurred from water, soil, or fertilizer.

On his own, Dr. Simone conducted an experiment of spiking water with DMAA and watering geranium plants. Ex. I, Simone Dep. 161:17 - 162:10. He added DMAA to water at approximately the same concentration levels as he reportedly found in the geranium samples. *Id.* 162:11-18; 165:7 – 166:7. Dr. Simone testified that this effort "almost killed the plants." *Id.* 161:17-21. Dr. Simone was asked "if geranium plants naturally produce DMAA at the concentration levels that you found it in your test for USP Labs, why pouring that concentration level over them in water would kill them." *Id.* 167:17-22. Dr. Simone testified: "I don't know." *Id.* 168:4.

Both Intertek and Dr. Simone testified that their studies, which followed the same basic approach of testing a small number of samples, were not designed to determine whether DMAA was naturally produced by the geranium plant. Intertek further testified that its study does not show DMAA is naturally

produced by the geranium plant.  Dr. Simone's additional work discovered a plausible source of sample contamination through DMAA's presence in fertilizer; yet nothing was known of the soil, water or fertilizer used on the samples he and Intertek tested.  Just as the chemical DDT would not be a constituent of a botanical merely because it was found in samples of plants in areas where DDT is sprayed, the chemical DMAA is not a constituent of a botanical because its presence was reported in a handful of samples.  Rather, DMAA is not a constituent of a botanical because there is no evidence of a biosynthetic pathway by which a plant could make it.

### 3. DMAA is not a dietary substance for use by man to supplement the diet by increasing the total dietary intake.

DMAA also does not qualify as a dietary substance for use by man to supplement the diet by increasing the total dietary intake.  21 U.S.C. § 321(ff)(1)(E).  The term "dietary" means "of or relating to diet," and "diet" means "an organism's usual food and drink."  Welch Decl. ¶ 10.  The term "dietary substance for use by man" means a substance commonly used by people as human food or drink in their usual diet.  *Id.*  It is not possible to increase the "total dietary intake" of something that is not part of the human diet.  *Id.*

Hi-Tech alleges that humans consume geraniums and DMAA is in geranium plants, so humans consume DMAA as part of their diets. *See* Ex. G, Wheat Dep. 156:6-15. As shown above, however, DMAA is not a constituent of the geranium plant.[7] Moreover, the dietary substance specifically at issue in this case is DMAA, not the geranium plants. A search by FDA of numerous food databases and the published scientific literature did not reveal any evidence that DMAA is or has been a component or ingredient in any food commonly consumed as part of the usual human diet. Welch Decl. ¶¶ 11-13. Thus, because DMAA is not a part of humans' usual diet, it is not a dietary substance for use by man to supplement the diet by increasing the total dietary intake.

### B. **DMAA Is Not GRAS.**

Because DMAA is intended to become a component of a food and is not a dietary ingredient under 21 U.S.C. § 321(ff)(1), Hi-Tech must establish that

---

[7] As FDA has explained in a guidance for industry, contaminants in a plant do not qualify as a dietary ingredient under 21 U.S.C. § 321(ff)(1)(E) because contaminants are consumed unintentionally and not to increase the dietary intake. *See* FDA, *Dietary Supplements: New Dietary Ingredient Notifications and Related Issues: Guidance for Industry*, 2016, at 37, http://www.fda.gov/ downloads/Food/GuidanceRegulation/GuidanceDocumentsRegulatoryInforma tion/UCM515733.pdf. Accordingly, if DMAA were a contaminant in the geranium plant and if geranium plants are used for human consumption, it would not qualify as a dietary ingredient under 21 U.S.C. § 321(ff)(1)(E).

DMAA is GRAS under the conditions of its intended use in food, in order to avoid regulation as a food additive.[8] 21 U.S.C. § 321(s); *see, e.g.*, *Article of Food*, 752 F.2d at 15 ("The burden of proving general recognition of safe use is placed on the proponent of the food substance in question.").

Hi-Tech can meet its burden only by showing that DMAA is "generally recognized, among experts qualified by scientific training and experience to evaluate its safety, as having been adequately shown through scientific procedures (or, in the case of a substance used in food prior to January 1, 1958, through either scientific procedures or experience based on common use in food) to be safe under the conditions of its intended use" ("GRAS"). 21 U.S.C. § 321(s); *see, e.g.*, *Fmali Herb, Inc. v. Heckler*, 715 F.2d 1385, 1390-91 (9th Cir. 1983) (noting in the context of food additives that because "the overriding purpose of the [FFDCA] is to protect the public health, the burden of proof of safety to be borne by a proponent of an ingredient is heavy").

"General recognition of safety may be based only on the views of experts

---

[8] Hi-Tech does not allege, and it is not the case, that DMAA meets any of the other exceptions in the food additive definition. DMAA is not known to be a pesticide chemical residue in or on a raw agricultural commodity or processed food, a pesticide chemical, or a color additive. Keefe Decl. ¶ 26. DMAA is not a new animal drug. *Id.* DMAA was not granted a sanction or approval by FDA before September 6, 1958 under any of the relevant statutes. *Id.* ¶ 27.

qualified by scientific training and experience to evaluate the safety of substances directly or indirectly added to food." 21 C.F.R. § 170.30(a). Moreover, "[g]eneral recognition of safety requires common knowledge about the substance throughout the scientific community knowledgeable about the safety of substances directly or indirectly added to food that there is reasonable certainty that the substance is not harmful under the conditions of its intended use." *Id.*; *see* Keefe Decl. ¶¶ 9-11 (providing additional definitions and citing to additional materials). A "qualified expert" is an individual who is qualified by scientific training and experience to evaluate the safety of substances under the conditions of their intended use in food. *See* 21 C.F.R. § 170.203.

Testimony that a single expert believes DMAA to be safe at a particular dosage does not satisfy the statutory standard to demonstrate that DMAA is *generally recognized* as safe for consumption in food. *See, e.g., Article of Food*, 678 F.2d at 740 (distinguishing between company's experts who testified only that a substance was safe at a specific dose and Government's experts who testified that a substance was not GRAS); *United States v. 7 Cartons, More or Less*, 293 F. Supp. 660, 664-65 (S.D. Ill. 1968), *aff'd in relevant part*, 424 F.2d 1364, 1365 (7th Cir. 1970) (concluding that an expert opinion that a combination of substances when used as directed would be safe and effective was "not addressed to the statutory

standard" of GRAS). Similarly, testimony that a substance is *not unsafe* is insufficient to establish that the substance is *generally recognized* as safe. *See Article of Food*, 752 F.2d at 15.

A substance for which there is limited knowledge about the safety of its use in food is not GRAS. *See United States v. 41 Cases, More or Less*, 420 F.2d 1126, 1130 (5th Cir. 1970) ("The absence of scientific knowledge on the part of an expert and his colleagues is sufficient to show lack of general recognition of safety.").[9] Moreover, a substance about which there is a genuine dispute among qualified experts about its safe use in food precludes a GRAS finding. *See An Article of Food*, 752 F.2d at 15 n.6.

As discussed below, DMAA is not GRAS based on its common use in food, because there is no evidence of its use in food prior to January 1, 1958. DMAA is not GRAS based on scientific procedures. And DMAA does not meet any other exclusions from the statutory food additive definition.

### 1. DMAA is not GRAS based on use in food before January 1, 1958.

For Hi-Tech to prove that DMAA is GRAS based on common use in food

---

[9] Decisions of the old Fifth Circuit before October 1, 1981, are binding precedent within the Eleventh Circuit. *See, e.g., Bonner v. City of Prichard*, 661 F.2d 1206, 1209-11 (11th Cir. 1981) (en banc).

before January 1, 1958, it must show general recognition of safety "based solely on food use of the substance prior to January 1, 1958," and such general recognition "shall ordinarily be based upon generally available data and information. An ingredient not in common use in food prior to January 1, 1958, may achieve general recognition of safety only through scientific procedures." 21 C.F.R. § 170.30(c)(1).

Based on searches of literature and scientific databases, there is no evidence that DMAA has a history of common use in food before 1958. Keefe Decl. ¶¶ 12-14. The only use of DMAA before 1958 was as an active ingredient in Forthane, a drug manufactured by Eli Lilly. *Id.* ¶ 13. DMAA's use in a drug may not be used to establish that it is GRAS for use in food. *See* 21 C.F.R. § 170.30(c)(1) (requiring that the GRAS conclusion "be based solely on *food* use of the substance") (emphasis added); *United States v. Naremco, Inc.*, 553 F.2d 1138, 1143 (8th Cir. 1977) ("[T]he pre-1958 use of [the substance] as an animal drug cannot be considered probative of the 'experience based on common use in food' required by 21 U.S.C. [§] 321(s) to demonstrate its safety under the conditions of its intended use as a food additive."). Thus, Hi-Tech cannot meet its burden of proving that DMAA is GRAS based on the substance's common use in food before January 1, 1958.

## 2. DMAA is not GRAS based on scientific procedures.

Establishing that DMAA is GRAS based on scientific procedures "require[s] the same quantity and quality of scientific evidence as is required to obtain approval of a food additive" and "shall be based upon the application of generally available and accepted scientific data, information, or methods, which ordinarily are published, as well as the application of scientific principles, and may be corroborated by the application of unpublished scientific data, information, or methods." 21 C.F.R. § 170.30(b). Usually, such scientific evidence is published in peer-reviewed scientific journals. Keefe Decl. ¶ 15.

Dr. Dennis Keefe, the United States' GRAS expert, has thoroughly evaluated DMAA and concluded that it is not GRAS based on scientific procedures. Keefe Decl. ¶¶ 15-25. Dr. Keefe is the head of FDA's Office of Food Additive Safety, which has completed over 260 GRAS reviews during his tenure as Director. *Id.* ¶¶ 1, 3. In Dr. Keefe's opinion, much of which is corroborated by Hi-Tech's experts, there is insufficient data upon which qualified experts could conclude that DMAA is GRAS.[10]

---

[10] Hi-Tech's experts Drs. Mitchell Elkind, Michael Lumpkin, and Simone expressly denied having any opinion about whether DMAA is GRAS. Ex. K, Elkind Dep. 53:5-9; Ex. L, Lumpkin Dep. 118:11-21; Ex. I, Simone Dep. 53:12 – 54:1. Dr. Heuer testified that, although he had a "personal feeling" about

The limited published data available raises concerns and uncertainties about adverse health impacts that may be associated with DMAA. Researchers who studied DMAA warned that it should be avoided by those who are hypertensive (more commonly known as high blood pressure) or pre-hypertensive, which comprises a large portion of the U.S. population. Keefe Decl. ¶¶ 18, 20. There are numerous published case reports about adverse health outcomes suffered by individuals after consuming DMAA. *Id.* ¶ 18. Although these reports do not purport to establish cause-and-effect, the uncertainty they raise about what role DMAA may have played in the adverse outcomes would not lead qualified experts to conclude the substance is GRAS. *Id.*

Safety assessments about DMAA conducted by other competent authorities reveal no consensus among qualified experts about whether DMAA is GRAS. Keefe Decl. ¶¶ 23-25. In 2013, the U.S. Department of Defense's DMAA Safety Review Panel issued a report which, among other things, concluded that there was an elevated health risk associated with the use of

---

whether DMAA was GRAS, he had not "been asked to apply that and make the final decision." Ex. H, Heuer Dep. 74:6-10. Dr. Matthew Lee purported to offer a GRAS opinion for the first time during his deposition, but conceded that he could cite to no place in his expert declaration where he discussed whether DMAA is GRAS. Ex. M, Lee Dep. 65:14-66:14.

products containing DMAA and recommended further research to determine DMAA's association with adverse health effects. *Id.* ¶ 23. The Department of Defense Safety Panel also recommended that products containing DMAA not be sold on military bases. *Id.* The sale of products with DMAA is banned on military bases. Ex. H, Heuer Dep. 210:17-20; Ex. K, Elkind Dep. 140:9-13. Safety assessments conducted by or submitted to public health authorities in other countries, including Denmark, Germany, and the Netherlands, also expressed concerns about the limited data available about DMAA or its safety.[11] Keefe Decl. ¶ 24. Indeed, Hi-Tech stopped selling products with DMAA in Australia and the United Kingdom because it understood those countries to have banned DMAA. Ex. G, Wheat Dep. 145:4 – 146:1.

The existing published studies about humans' consumption of DMAA are insufficient to support a conclusion that DMAA is GRAS. Keefe Decl. ¶¶ 18-20. Generally, the DMAA studies were of short duration and involved small study populations, consisting of young, healthy, exercise-trained individuals. Keefe Decl. ¶ 19; *see* Ex. K, Elkind Dep. 128:20 – 129:14. These studies are too limited to

_____

[11] These other safety assessments considered many of the same materials about DMAA that were reviewed by the Parties' experts here. Ex. K, Elkind Dep. 149:5 – 151:16; Ex. L, Lumpkin Dep. 220:1 – 222:19, 228:20 – 230:7, 236:20 – 238:10.

establish that DMAA is GRAS, a conclusion that applies to the entire population of the United States.  Keefe Decl. ¶¶ 19-20; *see* Ex. K, Elkind Dep. 129:15 – 130:11, 130:18 – 131:6, 132:2-6 (agreeing that the studies "should be interpreted with caution" and the study populations were not typical of the general population, limiting the ability to extrapolate findings).  No studies have been conducted about the effects of DMAA consumption by those who are not young.  *See* Ex. K, Elkind Dep. 75:8-16 (not aware of any studies involving DMAA and people over age of 55).  Several of these studies stated that people with hypertension or who might develop hypertension should avoid DMAA.  Keefe Decl. ¶¶ 18, 20.  No studies indicate what the effect of DMAA would be on individuals who have hypertension or who are pre-hypertensive.  *See* Ex. K, Elkind Dep. 74:7-22.  No one knows the maximum safe dose of DMAA.  *See* Ex. L, Lumpkin Dep. 140:4-9.

Because a substance that is added to food may be consumed by the entire population over its lifetime, it is important to account for the effects of long-term or lifetime consumption of DMAA.  Keefe Decl. ¶ 17.  There are no published studies that address the long-term consumption of DMAA in food.  Keefe Decl. ¶ 17; *see* Ex. K, Elkind Dep. 87:14-21 (not aware of any studies involving consumption of DMAA by humans for more than 3 months); Ex. H, Heuer Dep. 89:13-22 (not aware of any clinical studies about DMAA more than 8 weeks); Ex.

L, Lumpkin Dep. 94:2-5 (not aware of any clinical trials involving DMAA longer than 3 months); Ex. G, Wheat Dep. 187:20 – 188:6 (Hi-Tech not aware of any long-term studies of DMAA). Similarly, there are no long-term or lifetime animal feeding studies on DMAA. Keefe Decl. ¶ 17; *see* Ex. L, Lumpkin Dep. 135:17-19 (not aware of any long-term animal studies involving DMAA).

Thus, Hi-Tech is unable to meet its burden of demonstrating that DMAA is GRAS based on scientific procedures.

### C. DMAA Is An Unsafe Food Additive And Its Presence In The Seized Articles Renders Them Adulterated.

As established above, DMAA is a food additive. DMAA is deemed to be unsafe unless it is a food contact substance or it is used in accordance with a specific regulation promulgated by FDA or exemption granted by FDA. 21 U.S.C. § 348(a). It is undisputed that DMAA is not a food contact substance. Ex. C, Claimants' Resp. to Request for Admis. No. 19. Moreover, DMAA's use as a food additive does not conform to the terms of an exemption for investigational use granted by FDA. Keefe Decl. ¶ 30 & n.5; *see* 21 U.S.C. § 348(a)(1). Finally, FDA has not promulgated any regulations regarding the safe use of DMAA as a food additive. Keefe Decl. ¶ 30 & n.5; *see* 21 U.S.C. § 348(a)(2).

Accordingly, the DMAA in the seized articles is an unsafe food additive,

and any articles of food containing DMAA are adulterated. *See* 21 U.S.C. §§ 348(a), 342(a)(2)(C)(i). Because no genuine issue of material fact exists that the seized articles containing DMAA are adulterated, the United States is entitled to summary judgment.

### III. <u>Hi-Tech's Claims Against FDA Are Unsupported by Law and Must Be Dismissed.</u>

Because the United States is entitled to summary judgment in the seizure action, "the claims in Hi-Tech's complaint fail." ECF No. 51, at 3. Even if considered on their merits, Hi-Tech's claims in the APA Action boil down to the incorrect (and unsupported) assertion that FDA may only regulate DMAA by rulemaking. Hi-Tech's claims are also procedurally defective in that they seek impermissible injunctive relief and review of a non-final agency action.

#### A. <u>FDA Is Not Required to Proceed Only By Rulemaking</u>

Hi-Tech has no support for the premise underlying its APA Action that FDA is limited to action against foods containing DMAA only through rulemaking. *See* APA Compl., ECF No. 41-1, at 12; *see, e.g., id.* ¶¶ 3, 20, 29; *see also id.* ¶ 32 ("Defendants continue to disregard their statutory obligations under [the Dietary Supplement Health and Education Act ("DSHEA")] by making these demands without formal rule making."). Although DSHEA provides a framework by which FDA may regulate dietary supplements, DSHEA is not a

stand-alone statute; its provisions were codified into the FFDCA.

In the FFDCA, Congress provided FDA the authority to regulate food and food additives, as well as numerous enforcement mechanisms to protect the public health. *See, e.g.*, 21 U.S.C. §§ 332 (injunction), 333 (criminal prosecution; civil monetary penalties), 334 (seizure). Congress also provided FDA with general authority to promulgate regulations for efficient enforcement of the FFDCA. 21 U.S.C. § 371(a). Congress left the choice of enforcement method to FDA's discretion. *Heckler v. Chaney*, 470 U.S. 821, 835 (1985) (noting that FFDCA enforcement provisions "commit complete discretion to [FDA] to decide how and when they should be exercised").

DSHEA does not create a requirement that FDA engage in rulemaking before bringing an enforcement action. *See generally* DSHEA, Pub. L. 103-417, 108 Stat. 4325. In fact, "DSHEA changed very little about the basic administrative tools available to the FDA for the regulation of dietary supplements. The Agency could still regulate dietary supplements *through enforcement actions or rulemaking." NVE, Inc. v. Dep't of Health and Human Servs.*, 436 F.3d 182, 186 (3d Cir. 2006) (emphasis added). It is simply a decision that the agency makes between case-by-case enforcement and taking rulemaking action. Both tools are available to FDA. *See Heckler*, 470 U.S. at 835.

One of the bedrock principles of administrative law is that "the choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *See SEC v. Chenery Corp.*, 332 U.S. 194, 203 (1947) (*Chenery II*); *see also NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974) (reaffirming *Chenery II* and holding that agency has discretion to conclude that adjudication would be as effective a means of gathering information as would notice-and-comment rulemaking). Thus, Hi-Tech's APA Action rests upon an entirely faulty legal premise without support in statute or judicial precedent.

**B.** ***Ewing* Prohibits This Court from Granting The Injunctive Relief Sought By Hi-Tech.**

Binding Supreme Court precedent establishes that district courts may not enjoin FDA from conducting investigations and taking enforcement actions under the FFDCA. *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 600-601 (1950); *see Se. Minerals, Inc. v. Harris*, 622 F.2d 758, 764 (5th Cir. 1980). The old Fifth Circuit noted *Ewing*'s "total and complete proscription on the district court's power both to undertake a pre-enforcement review of the FDA's determination of probable cause and to enjoin federal officials from acting upon that determination by seizing products or initiating enforcement proceedings

under the [FFDCA]." *Se. Minerals*, 622 F.2d at 764 n.10.  By seeking an injunction

"prohibiting [FDA] from . . . using warning letters, detention orders and seizures

against DMAA containing products," APA Compl. ¶ 27, Hi-Tech necessarily

asks this Court to engage in pre-enforcement review of FDA's enforcement

actions.  *See Se. Minerals*, 622 F.2d at 764.  Thus, Hi-Tech's claims for injunctive

relief run afoul of *Ewing* and must be denied.

### C.  Hi-Tech's APA Claims Must Be Denied Because FDA Has Not Engaged in Final Agency Action.

Federal courts only have jurisdiction over "cases and controversies of

sufficient concreteness to evidence a ripeness for review."  *Digital Props., Inc. v.

City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997).  In challenges to agency

actions, the ripeness principle is further embedded into the jurisdictional

framework through the APA's requirement of "final agency action" as a basis for

judicial review.  5 U.S.C. § 704; *see*, *e.g.*, *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871,

882 (1990).  For an agency action to be final, it "must mark the consummation of

the agency's decisionmaking process" and "must be one by which rights or

obligations have been determined, or from which legal consequences will flow."

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal quotations omitted).

Hi-Tech complains of three FDA actions related to DMAA:  (1) issuing

warning letters, *see* APA Compl. ¶¶ 19, 21; (2) making statements on FDA's

website, *see id.* ¶ 20; and (3) administratively detaining Hi-Tech's products, *see id.*

¶ 22.  None of these actions individually or collectively constitute final agency

action and, therefore, the APA claims should be dismissed.

FDA warning letters do not constitute final agency action.  *See, e.g., Holistic

Candlers & Consumers Ass'n v. FDA*, 664 F.3d 940, 944-45 (D.C. Cir. 2012) ("FDA

warning letters do not represent final agency action subject to judicial review.");

*Cody Labs., Inc. v. Sebelius*, 446 F. App'x 964, 969 (10th Cir. 2011) (same).

Likewise, FDA statements about DMAA on its website do not constitute final

agency action.  *See, e.g.*, 21 C.F.R. § 10.85(k); *Holistic Candlers*, 664 F.3d at 945

(statements about product on FDA's website under the heading "[e]nforcement"

not final agency action); *Se. Minerals*, 622 F.2d at 764 & n.11, 766 (FDA's "general

statement of agency policy" describing FDA's "formal position" that the product

in question could not be used legally was not final agency action).  FDA's

administrative detention of Hi-Tech's products (which was dissolved when the

detained items were seized in this action) does not constitute final agency action.

*See, e.g., Se. Minerals*, 622 F.2d at 764 (no final agency action even when FDA had

brought multiple seizure actions); *Dietary Supplement Coal. v. Sullivan*, 978 F.2d

560, 563-64 (9th Cir. 1992) (holding that "specific product seizures do not amount

to final agency action" and that FDA positions in litigation do not constitute a final administrative determination).

Even viewing FDA's actions with respect to DMAA in their totality, there is no final agency action. *See, e.g.*, *Se. Minerals*, 622 F.2d at 764 (finding no final agency action where FDA brought multiple seizure actions and issued policy statement that seized product could not be used legally); *Holistic Candlers*, 664 F.3d at 944–45 (holding that FDA warning letters and statements about product under "enforcement" heading of FDA website were not final agency action); *Schering Corp. v. Heckler*, 779 F.2d 683, 686 n.18 (D.C. Cir. 1985) (FDA officials' statements and FDA's position in seizure actions, not final agency action). Thus, Hi-Tech may not seek review of FDA's actions under the APA.[12]

_____

[12] Hi-Tech's APA claims also are unripe because Hi-Tech failed to exhaust the available administrative remedies. *See, e.g.*, *Darby v. Cisneros*, 509 U.S. 137, 146 (1993) (noting that in APA actions, a plaintiff must first "exhaust[] all administrative remedies expressly prescribed by statute or agency rule"). Here, Hi-Tech bypassed the available citizen petition process set out in FDA regulations. *See* 21 C.F.R. § 10.45(b). Courts generally require exhaustion of FDA's citizen petition process when there has been no final agency action, even if there is a pending seizure action. *See, e.g.*, *Cody Labs.*, 446 F. App'x at 969 ("Courts have often dismissed suits against the FDA for failure to utilize the citizen petition procedure."); *Genendo Pharm. N.V. v. Thompson*, 308 F. Supp. 2d 881, 886 (N.D. Ill. 2003) (holding claims against FDA were unripe, even though a seizure action was pending, because "[p]laintiffs could have sought a formal administrative ruling from the FDA on the legality of its proposed importation by filing either a citizen petition or a request for an advisory opinion with the

### D. **Hi-Tech Has Not Alleged A Cognizable Due Process Claim**

Hi-Tech's fourth cause of action alleges a Fifth Amendment Due Process Clause violation based on a vague allegation that FDA has required Hi-Tech to stop manufacturing and recall its products containing DMAA. *See* APA Compl. ¶ 52. However, the Supreme Court has held that this seizure action provides Hi-Tech with "a full hearing before the court" and the judicial proceeding accompanying an FFDCA seizure action "satisfies the requirements of due process." *Ewing*, 339 U.S. at 598. Moreover, the allegations upon which Hi-Tech's Due Process claim is premised—that FDA has required Hi-Tech to stop selling and recall products with DMAA—are demonstrably untrue. No order to stop selling or recall products has been issued, and Hi-Tech sells products containing DMAA on its website. *See* Yellow Scorpion, Hi-Tech Pharmaceuticals, Inc., https://hitechpharma.com/products/yellow-scorpion (offering product Yellow Scorpion for sale with DMAA listed as an ingredient) (last visited Dec. 29, 2016). Accordingly, Hi-Tech cannot prevail on its Fifth Amendment claim.

### **CONCLUSION**

For all of the foregoing reasons, the United States respectfully requests that

---

agency"). Thus, Hi-Tech's failure to exhaust the available administrative remedies provides another reason why it cannot prevail on its APA claims.

this Court grant it summary judgment on the adulteration claims in the seizure action Amended Complaint and on Hi-Tech's APA Action, and issue an order condemning and forfeiting to the United States for destruction the seized articles that contain DMAA.

Respectfully submitted his 30th day of December, 2016.

JOHN A. HORN
*United States Attorney*
*600 U.S. Courthouse*
*75 Ted Turner Drive SW*
*Atlanta, GA 30303*
*(404) 581-6000   fax (404) 581-6181*

/s/ DAVID A. O'NEAL
DAVID A. O'NEAL
*Assistant United States Attorney*
Georgia Bar No. 342071
David.ONeal@usdoj.gov

OF COUNSEL:

MARGARET M. DOTZEL
*Acting General Counsel*

ELIZABETH H. DICKINSON
*Chief Counsel, Food and Drug Division*

ANNMARIE KEMPIC
*Deputy Chief Counsel, Litigation*

BENJAMIN C. MIZER
*Principal Deputy Assistant Attorney General*

JONATHAN F. OLIN
*Deputy Assistant Attorney General, Civil Division*

MICHAEL S. BLUME
*Director*

RICHARD GOLDBERG
*Assistant Director*

/s/ JAMES W. HARLOW
JAMES W. HARLOW
CLAUDE SCOTT
 Georgia Bar No. 631950
*Trial Attorneys*
*Consumer Protection Branch*
*450 Fifth Street, NW*
*Room 6400 – South*
*Washington, DC 20001*
(202) 514-6786
James.W.Harlow@usdoj.gov

Claude.Scott@usdoj.gov

Joshua A. Davenport
*Associate Chief Counsel for Enforcement*
*United States Department of Health and*
*Human Services*
*Office of the General Counsel*
*Food and Drug Administration*
*10903 New Hampshire Ave.*
*WO Bldg. 31, Rm 4536A*
*Silver Spring, MD 20993*
(301) 796-6717
joshua.davenport@fda.hhs.gov

**Certificate of Compliance**

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing brief has been prepared using Book Antiqua, 13 point font.

/s/James W. Harlow
*Trial Attorney*

**Certificate of Service**

The United States Attorney's Office served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

December 30, 2016

/s/ James W. Harlow
James W. Harlow
*Trial Attorney, Department of Justice*